(67 South. 958)

No. 20969.

STATE ex rel. LOUISIANA NAT. BANK v. HALL, Governor, etc.

(March 8, 1915.)

*(Syllabus by the Court.)*

1. COLLEGES AND UNIVERSITIES ⬦⟺7—STATE UNIVERSITY — BOARD OF SUPERVISORS — QUORUM.

Act No. 145 of 1876 provides that five members of the board of supervisors of the Louisiana State University and Agricultural and Mechanical College "shall constitute a quorum for the transaction of business; provided, that all the acts of said such [sic] five members, at said such meeting, shall be submitted for ratification or rejection at the next meeting of the board of supervisors, when a majority of all the fourteen members of the board may be present"—and there is no provision in the act for an "executive committee." Less than five members do not, therefore, constitute a quorum, either of the board or of any executive committee of the board, with power to transact business; hence where, during the intervals between the meetings of the board, three of the members meet together and assume to award or enter into a contract, their action imposes no obligation on the board, unless the board thereafter ratifies it and makes it its own; and a fortiori is that true where it appears that, of the three members who have so met, two of them were personally interested in the subject-matter of the alleged contract and asked to be excused from voting upon that account.

[Ed. Note.—For other cases, see Colleges and Universities, Cent. Dig. §§ 16–19; Dec. Dig. ⬦⟺7.] ·

2. COLLEGES AND UNIVERSITIES ⬳7—CONTRACT AFFECTING UNIVERSITY FUNDS—MANDAMUS.

Mandamus will not lie to compel the Governor, in his capacity of ex officio president of the board of supervisors of the Louisiana State University, etc., to sign a contract affecting the funds of the university which the board, in which the powers of the university are vested, has never entered into, authorized, ratified, or done anything about that could reasonably have misled the relator into the belief that it had taken such action. And a fortiori is that true where the board of supervisors, which alone is authorized to represent the university, is not made a party to the proceeding.

[Ed. Note.—For other cases, see Colleges and Universities, Cent. Dig. §§ 16–19; Dec. Dig. ⬳7.]

3. COLLEGES AND UNIVERSITIES ⬳6—UNIVERSITY FUNDS—DONATION—CUSTODY.

Money donated to "the Louisiana State University," etc., by the Peabody Educational Board, for the purposes of the university, is as much a part of the funds in charge of the board of supervisors of the university, within the contemplation of the law (Act No. 205 of 1912) regulating the custody of such funds, as any other money dedicated to such purposes and placed in charge of said board.

[Ed. Note.—For other cases, see Colleges and Universities, Cent. Dig. §§ 6, 11–15; Dec. Dig. ⬳6.]

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge; H. F. Brunot, Judge.

Mandamus by the State, on relation of the Louisiana National Bank, against L. E. Hall, Governor and President of Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College. From judgment for relator, defendant appeals. Reversed, and proceeding dismissed.

R. G. Pleasant, Atty. Gen., Harry Gamble, Asst. Atty. Gen., and Laycock & Beale, all of Baton Rouge, for appellant. Taylor & Porter, of Baton Rouge, for appellee.

MONROE, C. J. Defendant prosecutes this appeal from a judgment making peremptory an alternative writ of mandamus, directed to him, in his capacity as president of the board of supervisors of the Louisiana State University and Agricultural and Mechanical College (hereafter called the "University") and commanding him to forthwith execute agreeably to the provisions of Act No. 205 of 1912 and in accordance with an award made on June 23, 1914, a contract by and between said board and the Louisiana National Bank, relator herein, recognizing said bank as the fiscal agent of said board and binding said board to deposit in said bank, for the period ending August 15, 1916, all the funds belonging to, or under the control of, said board, including $40,000, commonly known as the "Peabody Fund," now on deposit in the Bank of Baton Rouge.

Act No. 205 of 1912 required the board of supervisors of the University to send out notices 30 days before the expiration of its then contract, calling for bids for the custody, on deposit, of all the funds in its charge, and "to let such funds to the highest bidder therefor consistent with the safety of such funds." Section 7, p. 420. And on May 23, 1914, notices were sent out, by the authority of what is called the "Executive Committee" of the board, to the effect that at 11 o'clock a. m., on June 23, 1914, bids for the custody of the funds of the University would be opened, in the president's office, and that the contract would be let in accordance with said act. Among the bidders who responded were the Capital City Bank, Baton Rouge Bank and Louisiana National Bank, all of Baton Rouge; each of the two first mentioned bidding for one-half, and the last mentioned for all, of the funds, and each offering to pay interest at 4.99 per cent. (which was the highest rate offered), and to comply with the act of 1912. Of the so-called Executive Committee, by which the bids were received and opened, there were three members (out of five constituting the whole committee) present, and two of them asked to be excused from voting on the ground that they were holders of stock in one of the banks above mentioned. With the concurrence, however, of the remaining member of the committee and the representative of the banks, who agreed that the funds

should be equally divided between them, the contract was awarded to the banks hereinabove mentioned. There was a delay of several weeks following the award, and, relator having made demands that the contract be reduced to writing and executed, there was tendered to it, about August 15th, an instrument purporting to express the contract, but excluding therefrom the $40,000 heretofore mentioned, which was then on deposit, to the credit of the University, in the Bank of Baton Rouge, which instrument relator refused to sign, and thereupon brought this suit, alleging that it is the mandatory duty of the ex officio president of the University to sign a contract in which shall be included the $40,-000 in question, and praying that he be ordered so to do.

To the demand thus made, there was an exception and answer to the effect that the action of the Executive Committee (so-called) imposed no obligation on the University unless and until ratified by the board of supervisors, and that the $40,000 referred to is a special fund, not within the contemplation of Act 205 of 1912.

[1] The University, as now existing, was created by Act No. 145 of 1876 (published with the acts of 1878, at page 18), being an act entitled—

"An act to unite the Louisiana State University * * * and the Agricultural and Mechanical College * * * under the name * * * of the Louisiana State University and Agricultural and Mechanical College, and to establish and locate the same temporarily at Baton Rouge."

The act provides (section 5) that the University shall be under the control of 15 supervisors "who shall be a body corporate, under the style and title of the board of supervisors of the Louisiana State University and Agricultural and Mechanical College"; that (section 6) the Governor shall be ex officio member of the board; that the 12 remaining members shall be appointed by the Governor, by and with the advice and consent of the Senate; that one of the 12 shall reside in the parish of East Baton Rouge; "that the member * * * appointed for the parish of East Baton Rouge, * * * shall be ex officio the vice president of the board. * * * Five members of the board, * * * including the president or vice president shall constitute a quorum for the transaction of business; provided, that all the acts of said such five members, at said such meeting, shall be submitted for ratification or rejection at the next meeting of the board of supervisors, when a majority of all the fourteen members * * * may be present."

[2] It will be seen, therefore, that five members constitute a quorum of all the members of the board, but with authority to take tentative action only, and that the action taken by them can bind the board only in the event of its being ratified by the board, at its next meeting. It will also be seen that, whilst any five members may, perhaps, assemble and call themselves a quorum, such action does not constitute them an executive committee; for if it did, perhaps three of the five could act for the committee, whereas no less than five can act as a quorum of the board. No one was able to testify that any "Executive Committee" has ever been appointed, though it appears that members of the board have, as they have supposed, been members of such a committee for many years. All agree that the action of the committee has always been referred to the board, at its next ensuing meeting, for ratification or rejection, and no one recalled an instance in which the board has failed to ratify. It remains, nevertheless, that the action here in question had never been submitted to the board at the time this suit was brought, and hence had never been ratified. Beyond that, as two (of the three) members who were present when that action was taken recused themselves, it is evident that,

even supposing that there was a committee (of five) there was no action taken by it, since only one of the members participated in what was done. It is said that the respondent signed the contracts (excluding the $40,000) with the other two banks, and that he is estopped to deny his authority to sign the contract here set up. The Governor, by virtue of his office, appoints the members, and is president of the board of supervisors; but as ex officio, president of the board he is authorized merely to preside over its deliberations, with the right to vote, implied (perhaps) from that fact, and (undoubtedly) from the fact that he may be one of the five members required to make a quorum, but that authority and right vest in him no power to bind or estop the board with respect to an alleged contract which it has never entered into, authorized, ratified, or done anything about that could reasonably have misled the relator into the belief that it had taken such an action; for the most that can be said is that, agreeably to the terms of its charter, it has allowed five of its members, constituting a quorum of the whole body (but assuming that they constituted an Executive Committee), to enter into tentative engagements, during the intervals between its meeting, subject to the condition (which is shown never to have been disregarded) that their action should be submitted to its next meeting, for ratification or rejection, whereas in this case relator is relying upon the action of one member of the board out of three who were present at a supposed meeting of a quorum of the board (where five were required), or of the supposed committee of five, which action has not been submitted to or ratified by the board. Beyond that the matter is one in which the University is concerned and the "power to sue and be sued * * * and, in general, to do all acts, for the benefit of the * * * University, * * * which are incidental to

bodies corporate," is conferred upon the board of supervisors (Act 145 of 1876, § 5), and not upon its ex officio president, and the board has not been cited to appear in this case.

[3] There is no merit in the other defense, since the $40,000 to which it refers was sent by the Peabody Educational Board to the University to be used for the purposes of the latter, and, unless expended for those purposes, is still in the possession of the University, and is just as well within the contemplation of act No. 205 of 1912 as any other fund so situated.

For the reasons thus stated mandamus will not lie.

It is therefore ordered and decreed that the judgment appealed from be set aside, that relator's demands be rejected, and that this proceeding be dismissed at its cost.